## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DANIEL JAMES NOLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13-CV-895-NJR-DGW |
| | ) | |
| LESLEE BROOKS and | ) | |
| RANDALL S. PASS, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

Currently pending before the Court is the Motion for Summary Judgment filed by Defendants Leslee Brooks and Randall S. Pass, M.D. (Doc. 39) and the "Proposal for Final Pretrial Conference and Motion for Summary Judgment" filed by Plaintiff Daniel Nolan (Doc. 47). For the reasons set forth below, Defendants' Motion for Summary Judgment is granted, and Plaintiff's Proposal for Final Pretrial Conference and Motion for Summary Judgment is denied.

## <u>INTRODUCTION</u>

Plaintiff Daniel James Nolan, an inmate in the custody of the United States Bureau of Prisons ("BOP"), filed this *pro se* lawsuit in August 2013, pursuant to *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1991), which permits suits for damages against federal officers for constitutional violations. More specifically, Plaintiff alleges that since his arrival at the United States Penitentiary in Marion, Illinois ("USP Marion") in January 2009, he has suffered from constant and debilitating pain in the left side of his chest, arm,

and groin area that medical personnel at the prison have failed to adequately treat (*see* Doc. 1, p. 5).

Following an initial screening of Plaintiff's complaint pursuant to 28 U.S.C. §1915A, Plaintiff was allowed to proceed on one count against Defendant Leslee Brooks,[1] a physician assistant at USP Marion, for deliberate indifference for allegedly failing to provide Plaintiff with prescribed medication or treatment to alleviate his pain (Doc. 5, p. 3).[2] Plaintiff also was permitted to proceed against Defendant David Szoke, the Clinical Director for Health Services at USP Marion, in his official capacity only for purposes of injunctive relief (Doc. 5, p. 3). Defendant Randall Pass was substituted for Defendant Szoke on August 22, 2014, pursuant to Federal Rule of Civil Procedure 25 (Doc. 34). As such, Plaintiff is now proceeding in this lawsuit on one count against Defendant Brooks for deliberate indifference and against Defendant Pass for purposes of injunctive relief.

Defendants filed the motion for summary judgment now before the Court on June 12, 2015 (Doc. 39). Contemporaneous with the filing of their motion, Defendants filed a Rule 56 Notice, informing Plaintiff of the perils of failing to respond to their motion for summary judgment within the 30-day timeframe (*see* Doc. 40). The Certificate of Service on these documents indicates that a copy was sent to Plaintiff at USP Marion on June 12, 2015, via the United States Postal Service (Doc. 39, p. 20; Doc. 40, p. 4). Despite the notice, Plaintiff did not file a timely response to Defendants' motion for summary judgment.

---

[1] The Court notes that Plaintiff's medical records refer to "Leslee Duncan," which is Defendant Brooks' maiden name (*see* Doc. 39-3, n.1).

[2] Because Plaintiff's original complaint was not signed (*see* Doc. 1, p. 6), he filed a First Amended Complaint to correct the error on April 9, 2014 (Doc. 23). Aside from the inclusion of Plaintiff's signature on the First Amended Complaint, it does not differ from the original; accordingly, the Court's screening order (Doc. 5) controls with respect to Plaintiff's First Amended Complaint.

On February 8, 2016, however, Plaintiff filed a motion captioned "Proposal for Final Pretrial Conference and Motion for Summary Judgment" (Doc. 47). In addition to being significantly out of time (the dispositive motion filing deadline in this matter was June 12, 2015), Plaintiff's motion is wholly without argument or evidence. The Court notes that Plaintiff merely asserts that he moves for summary judgment in his favor "based on the NO argument, NO notice of intent, evidence, papers, NO denials of any statues or law." This filing cannot be construed as either a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 or a response to Defendants' motion for summary judgment. Accordingly, Plaintiff's motion (Doc. 47) is denied.

## FACTUAL BACKGROUND

The undisputed material facts indicate that Plaintiff first arrived at USP Marion on January 13, 2009 (Doc. 39-1, ¶6). On this same date, Defendant Brooks conducted a medical screening of Plaintiff (Doc. 39-1, ¶8; *see also* Doc. 39-3, pp. 18-21). Plaintiff made no mention of any complaints concerning pain in his left side, arm, or groin (Doc. 39-1, ¶8; Doc. 39-3, pp. 18-21). Nine days later, Defendant Brooks conducted a more comprehensive history and physical and noted that Plaintiff used dentures and eyeglasses (Doc. 39-1, ¶8; Doc. 39-3, pp. 22–31). Once again, Plaintiff had no complaints, and the examination indicated he was healthy and required no restrictions (Doc. 39-1, ¶8; Doc. 39-3, pp. 22–31).

Plaintiff's medical records demonstrate that the first time he reported back pain at USP Marion was on October 16, 2009 (Doc. 39-1, ¶¶8, 9; Doc. 39-3, pp. 8-10). More specifically, Plaintiff reported that he had been experiencing intermittent back pain for

three days and that his right hand was swollen and discolored at times (Doc. 39-1, ¶¶8, 9; Doc. 39-3, pp. 8-10).[3]  After examining Plaintiff, Defendant Brooks was unsure whether his back pain and the issues with his right hand were connected (Doc. 39-3, p. 9). She suspected that the swelling and discoloration in his hand was due a vascular issue, possibly Raynaud's disease (Doc. 39-1, ¶9; Doc. 39-3, pp. 8-10).[4]  She prescribed Diltiazem, a calcium channel blocker ("CCB") designed to improve blood flow, to address Plaintiff's possible diagnosis of Raynaud's disease and indomethacin, a non-steroidal anti-inflammatory drug, for his back pain (25mg three times a day for thirty days) (Doc. 39-1, ¶9; Doc. 39-3, p. 9).

On October 21, 2009, Defendant Brooks discussed Plaintiff's symptoms with Dr. Paul Harvey, the Regional Medical Director, and they agreed to temporarily discontinue the Diltiazem until the Raynaud's diagnosis was confirmed (Doc. 39-1, ¶10). The next day, Plaintiff saw Defendant Brooks for a follow-up examination of his right hand (*Id.*; Doc. 39-3, pp. 2-5). Defendant Brooks performed a test that showed normal circulation in his hand (Doc. 39-1, ¶10; Doc. 39-3, p. 3). She also ordered various lab tests, as well as x-rays, to inform a possible vascular diagnosis (Doc. 39-1, ¶10; Doc. 39-3, p. 3). The x-rays were negative (Doc. 39-4, pp. 39, 54).

---

[3] Many of Plaintiff's medical records cite complaints of ailments concerning his right-side; however, the Court finds that discussion about these medical records is pertinent and relevant here as his complaints later evolved to include his left-side.

[4] The National Heart, Lung, and Blood Institute of the National Institutes of Health (NIH) describes Raynaud's as a rare disorder that affects the arteries. The disorder is marked by brief episodes of vasospasms in which the blood vessels in the arteries narrow causing a reduction in blood flow to affected body parts, most commonly the fingers and/or toes. Cold temperatures or stress can trigger an episode. During an episode, little or no blood flows to affect body parts, causing the skin to turn white and then blue for a short time. As blood flow returns, the affected areas may turn red and throb, tingle, burn, or feel numb. *What is Raynaud's*, NAT'L HEART, LUNG, AND BLOOD INSTITUTE, NAT'L INSTITUTES OF HEALTH, http://www.nhlbi.nih.gov/health/health-topics/topics/raynaud/ (last visited March 2, 2016).

Following this examination, Defendant Brooks sought approval from the Utilization Review Committee ("URC") to send plaintiff to an outside physician for a Doppler ultrasound to analyze his vascular issue (Doc. 39-1, ¶11; *see* Doc. 39-4, p. 40). The request was deferred so that Plaintiff could be monitored for further developments and evaluation (Doc. 39-1, ¶11; Doc. 39-4, p. 40). After more lab results were obtained in late December 2009, Plaintiff was approved to see Dr. Amar Sawar, an outside clinician specializing in rheumatology and neurology (Doc. 39-1, ¶12; *see also* Doc. 39-4, pp. 31, 53).

Dr. Sawar saw Plaintiff on February 22, 2010 (Doc. 39-1, ¶12; Doc. 39-4, pp. 46–48). Dr. Sawar assessed Plaintiff as having symptoms consistent with Raynaud's disease and requested x-rays and various lab tests, including tests for rheumatoid factor, lupus, and thyroid disorder, to confirm (Doc. 39-1, ¶12; Doc. 39-4, pp. 48, 56). The x-rays and lab tests were all negative (Doc. 39-1, ¶12; Doc. 39-4, pp. 28–29, 49–52). In July 2010, Dr. Harvey discussed the test results with Plaintiff and provided him with information on Raynaud's (Doc. 39-12, ¶13; Doc. 39-4, p. 16). The Director did not feel that any medications were needed at that time (Doc. 39-12, ¶13; Doc. 39-4, p. 16).

According to the medical records, after his appointment with Dr. Sawar, Plaintiff did not report any further problems with his suspected Raynaud's disease until October 13, 2010, despite being treated on at least eight occasions for various other health issues (Doc. 39-1, ¶15; Doc. 39-4, pp. 6–27).[5] Specifically, Plaintiff complained about recurrent

---

[5] On April 21, 2010, Plaintiff was seen for an ingrown toenail (Doc. 39-4, pp. 26–27). Plaintiff had an eye exam on May 13, 2010 (*Id.* at pp. 23–24). On May 20, 2010, Plaintiff had his ingrown toenail removed (*Id.* at pp. 21–22). On June 4, 2010, Plaintiff was seen for a rash (*Id.* at pp. 19–20). Plaintiff was seen for another ingrown toenail on July 2, 2010 (*Id.* at pp. 17–18). Plaintiff had a more comprehensive eye exam on

arm pain, swelling, and discoloration; he also complained of numbness in his right side that made it difficult to walk (Doc. 39-1, ¶15; Doc. 39-4, p. 6). Importantly, there is no indication that Plaintiff had complained about any pain in his left chest, arm, or groin (*see* Doc. 39-4, p. 6). Defendant Brooks examined Plaintiff and prescribed him Meloxicam, an NSAID often used to treat arthritis and related symptoms such as pain, swelling, and stiffness, to address his lower back pain and Raynaud's disease (Doc. 39-1, ¶15; Doc. 39-4, pp. 6-7). No further treatment was ordered because Plaintiff had a follow-up appointment with Dr. Sawar on October 22, 2010 (Doc. 39-1, ¶15; Doc. 39-4, p. 5). Dr. Sawar prescribed Procardia, a CCB, but Defendant Brooks substituted Amlodipine, which is the generic form of Procardia (Doc. 39-1, ¶16; Doc. 39-4, p. 5).

One week later, Plaintiff saw Defendant Brooks and complained that he did not believe the medication was helping and that his condition was worsening (Doc. 39-1, ¶17; Doc. 39-4, p. 4). He also complained of back pain, so Defendant Brooks ordered x-rays of his spine, which came back negative for any abnormalities (Doc. 39-1, ¶17; Doc. 39-4, pp. 4, 33, 39). On November 1, 2010, Defendant Brooks asked the URC to approve a follow-up appointment with Dr. Sawar, but the URC denied the request (Doc. 39-1, ¶18; Doc. 39-4, p. 34). Plaintiff continued taking the Meloxicam and Amlodipine (Doc. 39-1, ¶18).

Later in November, Plaintiff was seen for a sore throat and runny nose (Doc. 39-1, ¶19; Doc. 39-4, pp. 2–3). There is no indication that he complained of any problems with his suspected Raynaud's disease (*see* Doc. 39-4, pp. 2–3). In January 2011, Plaintiff was

---

August 4, 2010 (*Id.* at pp. 12–14). On August 20, 2010, Plaintiff was seen for rectal itching (*Id.* at pp. 10–11). On September 27, 2010, Plaintiff had his medication for the rectal itching renewed (*Id.* at p. 8).

seen again for his rectal itching (Doc. 39-1, ¶19; Doc. 39-5, pp. 45–46). At that appointment, he reported his back pain was the same and had not improved (Doc. 39-5, p. 45). On March 2, 2011, Plaintiff was seen by Defendant Brooks and reported that he was still experiencing symptoms related to Raynaud's (Doc. 39-1, ¶20; Doc. 39-5, pp. 41–43). Defendant Brooks consulted with Dr. David Skoze, the Clinical Director, and they decided to switch Plaintiff to a different CCB with a higher dosage (Doc. 39-1, ¶20; Doc. 39-5, p. 43).

On March 10, 2011, Dr. Szoke reviewed Plaintiff's history again and felt that Plaintiff had "uncomplicated Raynaud phenomena" (Doc. 39-1, ¶20; Doc. 39-5, p. 39). Five days later, Dr. Skoze examined Plaintiff during a follow-up appointment (Doc. 39-1, ¶21; Doc. 39-5, pp. 36–38). Plaintiff reported a flare up of his symptoms, including discoloration and swelling in both hands (Doc. 39-1, ¶21; Doc. 39-5, pp. 36–38). Plaintiff noted that the pain and stiffness in his right wrist was worse than his left wrist, and his legs were not currently hurting, but such pain was common (Doc. 39-1, ¶21; Doc. 39-5, pp. 36–38). This caused Dr. Szoke to doubt that Plaintiff had a vascular disorder, and he ordered a new battery of blood tests (Doc. 39-1, ¶21; Doc. 39-5, pp. 36-38). Again, the results of the tests were negative and indicated there was no mixed connective tissue disorder (Doc. 39-1, ¶21; Doc. 39-5, pp. 52-63). Accordingly, Dr. Szoke concluded the data was consistent with a diagnosis of crystalline arthropathy, which is a joint disorder similar to gout, rather than Raynaud's (Doc. 39-1, ¶22; Doc. 39-5, p. 34). He recommended adding Colchicine, a medication used for gout-related conditions, as well as Indomethacin, an NSAID pain reliever (Doc. 39-1, ¶22; Doc. 39-5, p. 34). Defendant

Brooks followed Dr. Skoze's recommendation and prescribed those medications to Plaintiff on April 8, 2011 (Doc. 39-1, ¶22; Doc. 39-5, p. 33).

Three days later, Plaintiff complained about swelling in his hands during an examination with Dr. Szoke (Doc. 39-1, ¶; Doc. 39-5, pp. 29-30). Dr. Szoke noted there was no discoloration in Plaintiff's hands, but there was mild swelling and pain (Doc. 39-5, p. 29). Based on his examination and the previous test results, Dr. Skoze continued to doubt Plaintiff had a mixed connective tissue disorder, including Raynaud's; he believed it was crystalline arthropathy (Doc. 39-1, ¶23; Doc. 39-5, p. 29). Plaintiff followed up with Defendant Brooks on April 13 and April 22, 2011, regarding complaints of discomfort/pain, swelling, and redness in his hands (Doc. 39-1, ¶¶24, 25; Doc. 39-5, pp. 24-28). In coordination with Dr. Szoke, Defendant Brooks renewed Plaintiff's prescriptions for Colchicine, Indomethacin, and Nifedipine (Doc. 39-1, ¶ 25; Doc. 39-5, p. 24).

On June 6, 2011, Plaintiff complained that during the previous weekend he had pain emanating from his right shoulder to his right hand, but it felt better that day (Doc. 39-1, ¶26; Doc. 39-5, pp. 22–23). Defendant Brooks examined Plaintiff and noted minor swelling and normal color. Plaintiff advised that he thought the pain was becoming more common and that he had stopped taking his prescribed medications as he saw no improvement while taking them, and his pain was no worse without them (Doc. 39-1, ¶26; Doc. 39-5, pp. 22–23). Accordingly, Defendant Brooks discontinued his medications, and advised Plaintiff they would continue to monitor his condition (Doc. 39-1, ¶26; Doc. 39-5, pp. 22–23).

Plaintiff was next seen on June 23, 2011, with complaints of swelling, numbness, and increasing discomfort in his hands (Doc. 39-1, ¶28; Doc. 39-5, pp. 17–18). Defendant Brooks examined Plaintiff and found no swelling or discoloration (Doc. 39-1, ¶28; Doc. 39-5, pp. 17–18). Defendant Brooks prescribed Gabapentin, the generic for Neurontin, to treat possible nerve pain, and advised Plaintiff that the medication would not help immediately, and he needed to give it some time (Doc. 39-1, ¶28; Doc. 39-5, pp. 17–18). Plaintiff was asked to report whether he experienced any improvement with the medication (Doc. 39-1, ¶28; Doc. 39-5, pp. 17–18). During Plaintiff's next examination with Defendant Brooks on July 15, 2011, Plaintiff indicated the Gabapentin was not working, and he complained of continued right shoulder, back, and hand pain (Doc. 39-1, ¶29; Doc. 39-5, pp. 14–15). Defendant Brooks did not notice any swelling or redness; however, based on Plaintiff's complaints, she ordered that Gabapentin be discontinued (Doc. 39-1, ¶29; Doc. 39-5, pp. 14–15). Defendant Brooks prescribed Plaintiff Ibuprofen to alleviate his pain as needed (Doc. 39-1, ¶29; Doc. 39-5, p. 13).

Plaintiff saw Defendant Brooks once more in July, twice in August, and once in early September 2011, each time for complaints related to leg and arm pain and swelling (Doc. 39-1, ¶¶ 30–33; Doc. 39-5, pp. 3–12). Defendant Brooks examined Plaintiff on each occasion, and despite his reports, she found no evidence of swelling or other changes (Doc. 39-1, ¶¶ 30–33; Doc. 39-5, pp. 5, 8, 12). Additionally, at the September appointment, Plaintiff reported that his symptoms were improved, and he only experienced swelling when he exercised outside (Doc. 36-1, ¶33; Doc. 39-5, p. 3).

In late September, however, Plaintiff presented to sick call with continued

complaints of cold, painful hands (Doc. 39-1, ¶34; Doc. 39-5, pp. 2). Defendant Brooks, in consultation with Dr. Szoke, ordered an additional battery of blood tests, all of which were negative for any mixed connective tissue disorder, scleroderma, or inflammation (Doc. 39-1, ¶34; Doc. 39-5, pp. 2, 47-48). At this point, Plaintiff had been complaining about his symptoms for nearly two years. Defendant Brooks and Dr. Skoze continued to consult about Plaintiff (Doc. 39-1, ¶35). All diagnostic testing had come back negative, and neither CCBs, NSAIDs, nor nerve medication improved his symptoms (*Id.*). Defendant Brooks and Skoze determined that the best course was to periodically follow-up with Plaintiff and monitor his symptoms (*Id.*).

On February 23, 2012, Plaintiff complained to Defendant Brooks of right arm and shoulder pain and swelling (Doc. 39-1, ¶36; Doc. 39-6, pp. 33–34). Plaintiff explained that the pain and swelling had occurred after eating, and he believed his symptoms may be caused by an allergic reaction (Doc. 39-1, ¶ 36; Doc. 39-6, pp. 33-34). Defendant Brooks noted very mild swelling to Plaintiff's right fingers and advised Plaintiff to avoid commissary foods (Doc. 39-1, ¶ 36; Doc. 39-6, pp. 33-34). Defendant Brooks examined Plaintiff again on March 5 and March 13, 2012, for similar complaints regarding swelling and discoloration in his hands (Doc. 39-1, ¶¶37–38; Doc. 39-6, pp. 30-32). Defendant Brooks advised Plaintiff there was nothing further diagnostic to be done unless Plaintiff experienced significant changes in his symptoms (Doc. 39-1, ¶¶37–38; Doc. 39-6, pp. 30-32).

Later that month, Dr. Harvey, the Regional Medical Director, examined Plaintiff; he recommended sending Plaintiff back to Dr. Sawar for a follow-up examination (Doc.

39-1, ¶39; Doc. 39-6, p. 29). While awaiting his appointment with Dr. Sawar, Plaintiff presented at health services on May 3, 2012, with complaints of pain in both arms, his lower back, and chest (Doc. 39-1, ¶40; Doc. 39-6, pp. 23-27). Plaintiff was examined by both Defendant Brooks and Dr. Szoke (Doc. 39-1, ¶40; Doc. 39-6, pp. 23-27). No significant changes were revealed during Plaintiff's physical examination (Doc. 39-1, ¶40; Doc. 39-6, pp. 23-27). Because of Plaintiff's new report of chest pain, however, additional blood tests and a chest x-ray were ordered (Doc. 39-1, ¶40; Doc. 39-6, p. 24, 26; *see* Doc. 39-6, pp. 59-81). The chest x-ray indicated an elevated left hemidiaphragm and scarring; as such, Dr. Szoke ordered a chest CT for further evaluation (Doc. 39-1, ¶40; Doc. 39-6, p. 78).

Plaintiff saw Dr. Sawar on June 25, 2012; he noted that Plaintiff complained of numbness and tingling in his left hand for the past two months (Doc. 39-1, ¶41; Doc. 39-6, pp. 40–44). Dr. Sawar noted possible left carpal tunnel syndrome, Raynaud's disease, and a vitamin B12 deficiency (Doc. 39-1, ¶41; Doc. 39-6, pp. 40–44). He recommended that Plaintiff be placed on Procardia again (Doc. 39-1, ¶41; Doc. 39-6, pp. 40–44). Dr. Sawar also requested that EMG and nerve conduction studies be completed and that Nolan wear a cock-up splint for his left wrist (Doc. 39-1, ¶41; Doc. 39-6, pp. 40–44).

Dr. Skoze reviewed Dr. Sawar's notes (Doc. 39-6, p. 18). He stated that it was "[u]nclear at this point what is causing inmate[']s complaint"; Plaintiff "describes migratory pain and swelling from hands to shoulders, and chest" but his symptoms have "never [been] observed" by the medical staff (*Id.*). Per Dr. Sawar's

recommendations, Dr. Szoke ordered Plaintiff a cock-up left splint to be worn at all times except when showering, prescribed Plaintiff the generic form of Procardia, and ordered B12 injections (Doc. 39-1, ¶42; Doc. 39-6, pp. 17, 18). Dr. Szoke also noted that he would submit the request for the EMG and nerve conduction studies to the Utilization Review Committee for approval (Doc. 39-1, ¶42; Doc. 39-6, p. 18).

Despite being issued a left wrist splint, Plaintiff was regularly observed without it (Doc. 39-6, pp. 7, 10-12, 14). On July 31, 2012, Plaintiff presented at health services with complaints of recent pain in his right arm and shoulder and ongoing pain in his right hand and chest (Doc. 39-1, ¶43; Doc. 39-6, pp. 13–14). He reported his left wrist pain, however, had resolved (Doc. 39-6, p. 14). Defendant Brooks performed a physical exam, which was normal, and advised Plaintiff that various tests, including a CT scan of his chest, were scheduled in the next three weeks (Doc. 39-1, ¶43; Doc. 39-6, p. 14).

The CT scan was completed on August 24, 2012, and suggested an enlarged spleen (splenomegaly), potentially affecting Plaintiff's diaphragm and left lung base (Doc. 39-1, ¶44; Doc. 39-6, pp. 54-55). Accordingly, another battery of lab tests were ordered, none of which detected any abnormalities (Doc. 39-1, ¶44; Doc. 39-6, pp. 6, 46-52). Defendant Brooks met with Plaintiff on September 10, 2012, to discuss the results of his CT scan; she informed him he would be meeting with a surgeon for an evaluation of his spleen (Doc. 39-1, ¶44; Doc. 39-6, p. 5). During this appointment, Plaintiff asked what actions would be taken to address his left lower chest and left upper quadrant pain (Doc. 39-6, p. 5). Defendant Brooks advised Plaintiff that he was complaining of a new pain location, to which Plaintiff disagreed, stating that he had been complaining about it

"for a long time now" (*Id.*). Defendant Brooks reviewed Plaintiff's chart and found no reports of pain in his left lower chest and left upper quadrant (*Id.*).

On October 3, 2012, Plaintiff again complained to Defendant Brooks about pain in his left chest that worsened with movement and coughing (Doc. 39-1, ¶45; Doc. 39-6, pp. 2-3). Plaintiff's physical examination was normal, however, and it did not reveal any symptoms (Doc. 39-1, ¶45; Doc. 39-6, pp. 2-3). Defendant Brooks reviewed Plaintiff's recent CT scan and chest x-ray as she anticipated Plaintiff would be scheduled to see a general surgeon for evaluation of his enlarged spleen (Doc. 39-1, ¶45; Doc. 39-6, pp. 2-3). The following month, Plaintiff underwent nerve conduction and EMG testing, as previously requested by Dr. Sawar (Doc. 39-1, ¶46; Doc. 39-6, pp. 38-39). This testing revealed only mild evidence of left carpal tunnel syndrome (Doc. 39-1, ¶46; Doc. 39-6, p. 38). Plaintiff did not appear at sick call or a follow-up appointment until February 27, 2013 (Doc. 39-1, ¶47). At that time, Defendant Brooks discussed his cock-up splint and told him that based on the results of this testing, the splint was unnecessary, and the order for his splint was withdrawn (Doc. 39-1, ¶47; Doc. 39-7, p. 40).

On March 6, 2013, Plaintiff saw Dr. Sawar again (Doc. 39-1, ¶48; Doc. 39-7, p. 85). Plaintiff complained of discoloration of his fingers, but reported that he did not use his gloves all the time (Doc. 39-7, p. 85). Dr. Sawar noted there was no tenderness or swelling in Plaintiff's fingers, but indicated they felt cold (*Id.*). Dr. Sawar continued to assess Plaintiff's condition as Raynaud's disease and left carpal tunnel syndrome (*Id.*). Accordingly, Dr. Sawar recommended increasing Plaintiff's Procardia dosage to 90 milligrams per day and advised Plaintiff to wear gloves "whenever the atmosphere is

cold" (*Id.*). Dr. Szoke followed Dr. Sawar's recommendation and ordered a six-month prescription for Nifedipine ER (the generic form of Procardia), with an increased dosage of 90 milligrams per day (Doc. 39-1, ¶49; Doc. 39-7, p. 37). On March 21, 2013, however, Plaintiff presented to sick call and informed Defendant Brooks he was experiencing tightness in his chest, difficulty breathing, and swelling in his hands since taking the increased dosage of Procardia (Doc. 39-1, ¶49; Doc. 39-7, p. 35). Because of Plaintiff's complaints and his report that Nifedepine was ineffective, Defendant Brooks discontinued the prescription (Doc. 39-1, ¶49; Doc. 39-7, p. 36).

On April 24, 2013, Plaintiff saw an outside general surgeon, Dr. Clay Demattei, for a surgical evaluation of his enlarged spleen (Doc. 39-1, ¶50; Doc. 39-7, pp. 87-88). Dr. Demattei's physical examination of Plaintiff was normal; he saw no evidence of right or left upper extremity swelling and detected no obvious tingling or numbness in Plaintiff's fingers (Doc. 39-1, ¶50; Doc. 39-7, p. 87). Dr. Demattei reviewed Plaintiff's CT scan and noted a mild enlargement of the spleen with an elevated left hemidiaphram, but remarked "is of minimal clinical significance" (Doc. 39-7, p. 87). After reviewing Plaintiff's labs, Dr. Demattei noted Plaintiff's platelet count was minimally diminished, and he recommended obtaining another complete blood count ("CBC") in six months (*Id.* at pp. 87-88). Defendant Brooks discussed Dr. Demattei's findings with Plaintiff on May 3, 2013, and she advised Plaintiff that he would continue to be monitored and nothing new was planned at the time (Doc. 39-1, ¶51; Doc. 39-7, p. 32).

Plaintiff next presented to health services on May 20, 2013, complaining of continued left side pain and indicating he was now experiencing tenderness in his left

testicle (Doc. 39-1, ¶52; Doc. 39-7, p. 27). Defendant Brooks conducted a physical examination, which was normal, and advised Plaintiff he was scheduled to be examined by the Clinical Director soon (Doc. 39-1, ¶52; Doc. 39-7, pp. 27-28). Dr. Robert King, the Acting Clinical Director at Marion at the time, then conducted a comprehensive examination on Plaintiff on June 6, 2013 (Doc. 39-1, ¶53; Doc. 39-7, pp. 23-25). Plaintiff's physical examination did not reveal any abnormalities (Doc. 39-7, pp. 22-25). Dr. King noted that Plaintiff developed swelling in his right hand in 2009 that moved to his neck, face, and right leg and then to his left side; however, extensive testing over several years had "shown nothing" (*Id.* at p. 23). Dr. King noted that Plaintiff was frustrated, but he indicated that the only diagnosis that came to his mind was fibromyalgia, for which there is no known effective treatment (*Id.*). Dr. King recommended Plaintiff take over the counter anti-inflammatory medications as needed to treat Plaintiff's complaints of pain, and indicated that Plaintiff should follow-up at sick call and the chronic care clinic as needed (*Id.* at p. 25).

Later that month, Plaintiff saw Dr. Sawar for a follow-up appointment (Doc. 39-1, ¶54; Doc. 39-7, pp. 74–79). Plaintiff complained of episodes of swelling in his right hand, and occasionally in his left hand; Plaintiff denied any chest pain (Doc. 39-7, p. 74). Dr. Sawar again assessed Plaintiff's condition as Raynaud's disease and left carpal tunnel syndrome (*Id.*). Dr. Sawar recommended Plaintiff try Losartan, a medication used to improve blood flow (Doc. 39-1, ¶54; Doc. 39-7, p. 74). Dr. Sawar also requested an echocardiogram, pulmonary function test, chest x-ray, and various blood tests (Doc. 39-1, ¶54; Doc. 39-7, p. 74). In accordance with Dr. Sawar's recommendations, Defendant

Brooks entered a six-month prescription for Losartan and ordered the requested tests and labs, which were completed over the following weeks (Doc. 39-1, ¶54; *see* Doc. 39-7, pp. 21-22, 68-72, 81-82). Because Plaintiff's chest x-ray continued to suggest an elevated left diaphragm, Defendant Brooks consulted with Dr. Harvey, who recommended additional lab tests (Doc. 39-1, ¶54; Doc. 39-7, pp. 17, 20). These tests, along with an electrocardiogram, were performed in late August 2013, but failed to reveal any abnormalities (Doc. 39-1, ¶54; Doc. 39-7, 60-64).

Plaintiff saw Defendant Brooks on September 27, 2013, and reported that he was experiencing breathing problems (Doc. 39-1, ¶55; Doc. 39-7, pp. 14–15). Defendant Brooks prescribed an albuterol inhaler and requested a chest x-ray (Doc. 39-1, ¶55; Doc. 39-7, p. 15). She also ordered another chest x-ray, which continued to reference an elevated left hemidiaphragm (Doc. 39-1, ¶55; Doc. 39-7, pp. 15, 58). The following month, Plaintiff's inhaler was renewed because he said it helped with his shortness of breath (Doc. 39-1, ¶55; Doc. 39-7, p. 13). He also underwent various tests; his echocardiogram was normal, his chest CT was stable and unchanged, but his pulmonary function test revealed a moderate airway obstruction, which the medical staff subsequently monitored (Doc. 39-1, ¶55; Doc. 39-7, pp. 49–55). Following those tests, Plaintiff saw Dr. Sawar again on October 28, 2013 (Doc. 39-1, ¶56; Doc. 39-7, pp. 43–45). Dr. Sawar recommended increasing Plaintiff's Losartan dosage, and Defendant Brooks did so (Doc. 39-1, ¶56; Doc. 39-7, pp. 12, 43).

On November 25, 2013, Plaintiff was seen in the Chronic Care Clinic by FNP Casey Frank (Doc. 39-1, ¶57; Doc. 39-7, pp. 8–11). FNP Frank noted that all recent tests

were normal, and Plaintiff reported some improvement in his overall symptoms (Doc. 39-1, ¶57; Doc. 39-7, pp. 8–11). All of Plaintiff's prescriptions were renewed (Doc. 39-1, ¶57; Doc. 39-7, pp. 8–11).

In early January 2014, Plaintiff was reassigned to MLP Fernando Castillo due to changes in staffing and the inmate population at USP Marion (Doc. 39-1, ¶59). A review of Plaintiff's medical records evidences this reassignment as there is no indication Defendant Brooks provided any treatment or made any notes in Plaintiff's medical chart after December 2013 (*see* Docs. 39-8, 39-9). Since then, Plaintiff has been seen regularly, often more than once a month, by the medical staff at USP Marion (*see* Docs. 39-2, 39-8, 39-9). He has continued to complain of intermittent pain and swelling in his hands and pain in his chest, and he has also made new reports of pain in other areas of his body, including his hip and his right foot (*see* Doc. 39-2). The medical staff has prescribed new medications, referred him to a new specialist, and ordered a plethora of diagnostic tests (*see* Docs. 39-2, 39-8, 39-9). At the time the motion for summary judgment was filed in June 2015, Plaintiff's symptoms had not resolved, and no definitive diagnosis had been made (*see* Docs. 39-2, 39-8, 39-9).

## LEGAL STANDARDS

### A. Summary Judgment Standard

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

## B.  Deliberate Indifference Standard

Prison physicians are liable under the Eighth Amendment for cruel and unusual punishment if they are deliberately indifferent to an inmate's serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). That does not mean, however, that prisoners are "entitled to receive 'unqualified access to healthcare.'" *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "Instead, prisoners are entitled only to 'adequate medical care.'" *Holloway*, 700 F.3d at 1073 (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)).

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). A serious medical condition is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007).

Second, the plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Greeno*, 414 F.3d at

653. To do so, the plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious risk to the prisoner's health, and they consciously disregard that risk. *Holloway*, 700 F.3d at 1073. "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution.")

In order for a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Id.*; *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain*, 512 F.3d at 894–95). *See also Holloway*, 700 F.3d at 1073 ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." (quoting *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008))).

## DISCUSSION

For the purposes of the summary judgment motion, Defendants assume that Plaintiff's underlying condition constitutes an objectively serious medical condition

(Doc. 39, p. 12). Thus, the issue presented by the summary judgment motion is whether Defendants' conduct constituted deliberate indifference.

## A.  Defendant Leslee Brooks

In his complaint, Plaintiff does not allege that he was wholly ignored by Defendant Brooks; rather, Plaintiff asserts there has been outside consultations and recommendations that have been "set aside" and not adhered to by Defendant Brooks (*see* Doc. 1, p. 5). Plaintiff also contends that Defendant Brooks claimed to be monitoring his condition, but took no action to alleviate his pain (*see* Doc. 1, p. 5). Defendant Brooks, on the other hand, contends she is entitled to summary judgment on Plaintiff's claims because the medical records demonstrate that she closely monitored Plaintiff's condition; she promptly responded to changes in his status; she consulted other medical staff, as well as outside specialists, to evaluate and address Plaintiff's medical condition; and she provided appropriate treatment (Doc. 39). The Court has little difficulty agreeing with her.

The evidence, when viewed in a light most favorable to Plaintiff, belies his assertion that Defendant Brooks took no action to alleviate his pain. The record demonstrates that Defendant Brooks was consistently responsive to Plaintiff's complaints of swelling and pain on both his right and left sides from 2009 through 2013. She examined him more than twenty times during that time period. She regularly consulted with other BOP physicians, including Dr. Paul Harvey, Dr. David Szoke, and Dr. Robert King, about Plaintiff's case. Plaintiff also was examined on a number of occasions by those physicians. Defendant Brooks ensured Plaintiff was repeatedly seen

by two outside specialists. Collectively, Plaintiff's medical providers investigated a number of potential diagnoses, such as Raynaud's disease, crystalline atrophy, scleroderma, lupus, mixed connective tissue disorders, arthritis, and thyroid disorders. At the behest of Defendant Brooks and the other doctors, Plaintiff underwent diagnostic tests on countless occasions in an effort to determine what treatment was needed. Plaintiff also tried approximately a dozen different prescriptions, in various combinations and dosages, to alleviate his symptoms. Despite their extensive efforts, Plaintiff's medical providers were unable to definitively diagnose the source of his symptoms or find a completely effective treatment.

The evidence also belies Plaintiff's assertion that Defendant Brooks ignored or "set aside" the outside specialists' recommendations. As a matter of fact, it appears to the Court that she implemented all of the recommendations made by Dr. Amar Sawar and Dr. Clay Demattei, as well as the recommendations made by the BOP physicians.

Simply put, Defendant received an extraordinary amount of medical care from Defendant Brooks, BOP physicians, and outside specialists. While Plaintiff clearly disagrees with Defendant Brooks' course of treatment and is apparently frustrated by the difficulties in properly diagnosing his condition, it is well-established "[m]ere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to establish deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (citations omitted); *accord Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents [a] significant a departure from

accepted professional standards . . . ." *Pyles*, 771 F.3d at 409. Here, virtually all of Defendant Brooks's diagnoses and treatment decisions were made in consultation with or at the direction of at least one physician. Thus, there is simply no basis for finding that any of Defendant Brooks's treatment decisions were plainly inappropriate or a substantial departure from accepted medical judgment. Additionally, the fact that the care Plaintiff received was not as effective as he would like is not enough to support an Eighth Amendment claim. *See, e.g., Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. . . . To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd.")

For these reasons, Defendant Brooks is entitled to judgment as a matter of law.

**B. Defendant Randall S. Pass**

Defendant Pass was named as a defendant in this lawsuit only in his official capacity for purposes of carrying out any injunctive relief. Because Defendant Brooks is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim of deliberate indifference, Defendant Pass is also entitled to summary judgment at this juncture.

<u>CONCLUSION</u>

The Motion for Summary Judgment filed by Defendants Leslee Brooks and Randall S. Pass (Doc. 39) is **GRANTED**, and Plaintiff's motion captioned "Proposal for Final Pretrial Conference and Motion for Summary Judgment" (Doc. 47) is **DENIED**. Plaintiff's claims against Defendants are **DISMISSED with prejudice**. The Clerk of

Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff, and close this case on the Court's docket.

## NOTICE

If Plaintiff wishes to contest this Order, he has two options. He can ask the Seventh Circuit to review the Order, or he can first ask the undersigned to reconsider the Order before appealing to the Seventh Circuit.

If Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal *within 30 days* from the entry of judgment or order appealed from. FED. R. APP. P. 4(a)(1)(A). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. FED. R. APP. P. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 424 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard).

On the other hand, if Plaintiff wants to start with the undersigned, he should file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). The motion *must* be filed within twenty-eight (28) days of the entry of judgment, and the deadline *cannot* be extended. FED. R. CIV. P. 59(e); 6(b)(2). The motion must also comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010); *Talano v. Nw. Med. Faculty Found., Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) ("To prevail on a Rule 59(e) motion to

amend judgment, a party must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment.") (citation and internal quotation marks omitted).

So long as the Rule 59(e) motion is in proper form and timely submitted, the 30-day clock for filing a notice of appeal will be stopped. FED. R. APP. P. 4(a)(4). The clock will start anew once the undersigned rules on the Rule 59(e) motion. FED. R. APP. P. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). To be clear, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not stop the clock for filing a notice of appeal; it will expire 30 days from the entry of judgment. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Martinez v. Trainor,* 556 F.2d 818, 819–20 (7th Cir. 1977). Again, this deadline can be extended only on a written motion by Plaintiff showing excusable neglect or good cause.

The Court has one more bit of instruction regarding the appeals process. If Plaintiff chooses to appeal to the Seventh Circuit, he can do so by filing a notice of appeal in this Court. FED. R. APP. P. 3(a). The current cost of filing an appeal with the Seventh Circuit is $505.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* FED. R. APP. P. 24(a)(1)(C). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C). If he is allowed to proceed IFP on appeal, he will be assessed an initial partial filing fee. 28 U.S.C. § 1915(b)(1). He will then be required to make monthly payments until the entire

filing fee is paid. 28 U.S.C. § 1915(b)(2).

**IT IS SO ORDERED.**

**DATED:   March 7, 2016**

_____

**NANCY J. ROSENSTENGEL**
**United States District Judge**